UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BRUCE W. CRESS; PETER OCHABAUER;
WALTER BOULDEN; MARK A. KNUDSEN;
CHRISTOPHER J. PARKYN; AMANDA R.
OCHABAUER; and BERNARD C. LARKIN,
individually and on behalf of all
others similarly situated,

                    Plaintiffs,

        - against -                          06 Civ. 2717 (JGK)

                                             OPINION AND ORDER

GARY L. WILSON; DOUGLAS STEENLAND;
RICHARD ANDERSON; NORTHWEST
COMPENSATION COMMITTEE OF THE BOARD
OF DIRECTORS; FREDRIC V. MALEK;
DENNIS F. HIGHTOWER; GEORGE J.
KOURPIAS; V.A. RAVINDRAN; RICHARD C.
BLUM; PENSION INVESTMENT COMMITTEE;
TERRI L. KEIMIG, TIMOTHY J. MEGINNES;
JUDITH A. MUNZENRIDER; and UNKNOWN
FIDUCIARIES 1-100,

                    Defendants.
_____

JOHN G. KOELTL, District Judge:

        The plaintiffs, a number of participants in Northwest

Airlines' defined benefit pension plans for pilots and for

contract employees, bring this purported class action pursuant to

section 502 of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1132, against various defendants alleged

to be fiduciaries of the airline's pension plans.  The defendants

include members of Northwest's Board of Directors and the Board's

Compensation Committee; Northwest's Pension Investment Committee

(whose individual members are unknown to the plaintiffs); several employees who are alleged to have been fiduciaries of the plans; and the placeholder defendants "Unknown Fiduciaries 1-100."

The core of the plaintiffs' allegations is that the defendants breached their fiduciary duties in violation of ERISA by failing to fund the pension plans properly.  The plaintiffs allege that the pension plans were under-funded by approximately $5.7 billion during the period from October 1, 2000 until September 14, 2005, when Northwest filed for Chapter 11 bankruptcy (the "pre-bankruptcy period").  The allegations pertain to the funding of three defined benefit pension plans: one for pilot employees, one for contract employees, and one for salaried employees (collectively the "Plans").

Based on this predicate claim that the Plans were under-funded, the plaintiffs assert the following six causes of action under ERISA, against all of the defendants unless otherwise specified: (1) breach of fiduciary duties for failing to ensure that Northwest properly funded the Plans; (2) breach of fiduciary duties by only the director and Compensation Committee defendants for failing to monitor other fiduciaries; (3) breach of fiduciary duties for failing to provide complete and accurate information regarding Northwest's financial condition to the Plans' participants and beneficiaries; (4) breach of the fiduciary duty to avoid conflicts of interest; (5) participating in or aiding

2

and abetting Northwest's under-funding of the Plans; and (6) participating in or aiding and abetting Northwest's failure to notify the Plans and their participants of Northwest's under-funding of the Plans.

Earlier in this litigation, the defendants moved to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6).  The defendants argued that the plaintiffs had not identified any violation of ERISA's minimum funding standards, which were defined by statute during the pre-bankruptcy period using a "funding standard account," because they had not alleged any specific failure by Northwest to make an ERISA annual or quarterly installment as required by section 302 of ERISA, 29 U.S.C. § 1082, during the pre-bankruptcy period.  On June 6, 2007, this Court denied the motion, reasoning that the plaintiffs had alleged significant deficiencies in the Plans' funding in violation of ERISA, and that there was an issue of fact that could not be resolved on a motion to dismiss as to whether there was any under-funding with respect to the minimum funding standards.  The Court explained further that under the Rule 8 pleading standard, which applies to ERISA breach of fiduciary duty actions, the plaintiffs had been under no obligation to plead funding delinquencies with particularity.  See Cress v. Wilson, No. 06 Civ. 2717, 2007 WL 1686687, at *6 (S.D.N.Y. June 6, 2007).

3

Because of the centrality of the issue of whether the Plans had any funding delinquency in the pre-bankruptcy period, the Court ordered phased discovery which would be focused initially on whether there was a funding delinquency in the Plans.  On September 5, 2007, the Court issued a scheduling order for discovery to determine the Stage One Question: whether there was an actionable delinquency in the contributions required to be made to the Plans at any time during the pre-bankruptcy period under 29 U.S.C. § 1082, or any other funding delinquency in the Plans.  The Court set a deadline of January 31, 2008 for Stage One discovery, and deadlines of February 15, 2008 and February 29, 2008 for the plaintiffs and defendants, respectively, to make any Stage One expert disclosures.  The Court set March 21, 2008 as the date for the completion of expert discovery.  The Court authorized motions for summary judgment to be filed thereafter on the Stage One issue.

The defendants now move for Stage One summary judgment.  The plaintiffs oppose the motion and request a continuance pursuant to Fed. R. Civ. P. 56(f).

I


A

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if it appears that the nonmoving party cannot prove an element that is essential to the nonmoving party's case and on which it will bear the burden of proof at trial. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing

Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).

B

All of the claims in this action are based on breaches of the duties ERISA imposes on the fiduciaries of a pension plan. "ERISA is designed to protect employee pensions and benefit plans by, among other things, 'setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans.'" In re Worldcom, Inc., 263 F.Supp.2d 745, 756-57 (S.D.N.Y. 2003) (quoting Varity Corp. v. Howe, 516 U.S. 489, 496 (1996)). ERISA defines a fiduciary functionally, providing in relevant part: "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); see also Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 63 (2d Cir. 2006); Worldcom, 262 F.Supp.2d at 757 ("ERISA defines a fiduciary in functional terms of control and authority over the plan." (internal quotation marks omitted)).

ERISA defines the standard to which fiduciaries of a plan are held as that of a "prudent man."  Worldcom, 263 F.Supp.2d at 758. Section 404(a)(1) provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104(a)(1).

Section 404(a)(1) of ERISA thus imposes three "overlapping standards": to act "solely in the interests of the participants and beneficiaries," to act "for the exclusive purpose" of providing benefits to them, and to act with the care of a "prudent man."  Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir. 1982) (Friendly, C.J.).  These duties, which are drawn from the common law of trusts, have been described as "the highest known to the law."  Worldcom, 263 F.Supp.2d at 758 (quoting Flanigan v. Gen. Elec. Co., 242 F.3d 78, 86 (2d Cir. 2001)).  ERISA fiduciaries must manage the plan with "an eye single" to the interests of the plan's participants and beneficiaries.

Worldcom, 263 F.Supp.2d at 758 (quoting Donovan, 680 F.2d at 271).

Section 409(a) of ERISA imposes liability on a plan fiduciary who "breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter."  29 U.S.C. § 1109(a).  A breaching fiduciary is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."  Id.  In addition, section 405(a) imposes liability on a plan fiduciary for a breach of fiduciary responsibilities by a "co-fiduciary" (1) where the first fiduciary "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach," (2) where the first fiduciary's own breach enables the co-fiduciary to commit a breach, or (3) where the first fiduciary "has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."  29 U.S.C. § 1105(a).

In addition to the broadly worded fiduciary obligations outlined above, ERISA imposes specific minimum funding standards

9

on the sponsors of a pension plan.  It should be noted at the
outset that Congress has recently amended these minimum funding
standards in the Pension Protection Act of 2006, Pub. L. No. 109-
280, 120 Stat. 780.  However, these amendments are not relevant
to this case, because they occurred and apply only after the pre-
bankruptcy period.  Thus all ensuing discussion of and citations
to ERISA and the minimum funding standards imposed thereby refer
to ERISA as it existed during the pre-bankruptcy period, prior to
the 2006 amendments.

     During the pre-bankruptcy period, pension plan
administrators were required to provide certain information about
a plan to the participants and beneficiaries of the plan,
including notification of a failure to make a required payment to
meet the minimum funding standards imposed by § 1082.  See 29
U.S.C. § 1021(d).  ERISA's minimum funding standards were set
forth in sections 302-306 of ERISA, 29 U.S.C. §§ 1082-1086, and
in parallel and overlapping provisions of the Internal Revenue
Code, citations to which are omitted here.  The standards
operated through an accounting device called a "funding standard
account."  See ERISA §§ 302(a), (b), 29 U.S.C. §§ 1082(a), (b).
Each pension plan to which the minimum funding standards applied
had to establish and maintain such a funding standard account.
ERISA § 302(b)(1), 29 U.S.C. § 1082(b)(1).  The funding standard
account was a ledger on which the annual costs required under the

plan's funding method were balanced against the contributions made to the plan.   See ERISA § 302(b), 29 U.S.C. § 1082(b).

If at the end of any plan year, the ledger was not balanced because the total charges exceeded the total credits, an "accumulated funding deficiency" occurred.   ERISA § 302(a), 29 U.S.C. § 1082(a).   The statute made the plan's contributing employer (and all companies within that employer's "controlled group" of affiliated companies) legally responsible for contributing the amounts needed to avoid such a deficiency. ERISA § 302(c)(11), 29 U.S.C. § 1082(c)(11).   If a required contribution or installment was not made when due, and the total amount of the employer's deficiency exceeded $ 1 million, an automatic statutory lien arose in favor of the pension plan and on all of the employer's property and rights to property.   ERISA § 302(f), 29 U.S.C. § 1082(f).   Any such lien could be perfected and enforced by the Pension Benefit Guaranty Corporation ("PBGC").   ERISA § 302(f)(5), 29 U.S.C. § 1082(f)(5).

The costs to be charged to the funding standard account for a plan year included (1) the "normal cost" for that plan year (essentially the present value of benefits accruing under the plan's funding method that were assigned to the plan year), plus (2) the amounts necessary to amortize in equal annual installments the plan's unfunded liabilities over a specified

period of years.  ERISA §§ 302(b)(2)(A), (B), 29 U.S.C. §§ 1082(b)(2)(A), (B).

Credits to the funding standard account included (1) the amount contributed for the plan year, (2) amounts necessary to amortize actuarial gains, plus (3) the amount of any "waived funding deficiency."  ERISA §§ 302(b)(3)(A)-(C), 29 U.S.C. §§ 1082(b)(3)(A)-(C).  A "waived funding deficiency" meant the portion of the minimum funding standards that was waived by the Secretary of the Treasury and not satisfied by employer contributions.  ERISA § 303(c), 29 U.S.C. § 1083(c).  ERISA authorized the Secretary of the Treasury to grant such a funding waiver for a plan year under § 1083.

As noted, the funding standard account was to be credited with the amount considered contributed by the employer "for the plan year."  For this purpose, a contribution made within 8-1/2 months after the close of the plan year was deemed to have been made on the last day of the plan year.  ERISA § 302(c)(10)(A), 29 U.S.C. § 1082(c)(10)(A).

In the case of a plan that had unfunded current liability for a plan year, a portion of the required annual contribution could be prepaid in quarterly installments.  See ERISA § 302(e), 29 U.S.C. § 1082(e).  The sum of the four quarterly installments had to equal the lesser of the previous year's minimum funding requirements or 90% of the current year's requirements.  ERISA §

302(e)(4), 29 U.S.C. § 1082(e)(4).  Section 103(d) of ERISA, 29 U.S.C. § 1023(d), required every pension plan subject to the minimum funding standards to file an actuarial statement of the plan's funding standard account for each plan year.  This statement was filed as "Schedule B" to the plan's annual report on Form 5500.  See C.F.R. § 2520.103-1(b)(1); 2006 Instructions for Form 5500 at 23-33, available at http://www.irs.gov/pub/irs-pdf/i5500_06.pdf.  The statement had to include, among other things, information showing "the minimum contribution required under section 1082" applicable to the plan year for which the report was filed.  ERISA § 103(d)(3), 29 U.S.C. § 1023(d)(3).  The statement had to be prepared and signed by an "enrolled actuary" engaged on behalf of all plan participants by the plan's administrator.  ERISA § 103(a)(4)(A), 29 U.S.C. § 1023(a)(4)(A).  Thus, ERISA's regulatory framework required the minimum annual contribution for a plan to be determined and documented by the plan's enrolled actuary – a person "who is a trained professional subject to regulatory standards."  Concrete Pipe and Products of California, Inc. v. Construction Laborers, 508 U.S. 602, 603 (1993).

II


A

Pursuant to Local Civil Rule 56.1, a party moving for summary judgment must submit along with its notice of motion a statement of material facts (a "56.1 statement") as to which it alleges there is no genuine issue to be tried.  Each statement must be followed by a citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e).  The party opposing the motion must submit a responsive statement of facts as to which a triable issue remains.  If the opposing party fails to submit a responsive statement, then the facts set forth in the moving party's 56.1 statement are deemed admitted.  Local Civil Rule 56.1(a)-(c); see also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001).  However, "[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local 56.1 statement itself is not a vehicle for making factual assertions that are otherwise unsupported in the record."  Holtz, 258 F.3d at 74.  Moreover, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  Id. at 73.

In this case, the defendants have submitted a 56.1 statement with their motion for summary judgment.  The statements were

14

properly supported by citations to admissible evidence.  The
plaintiffs have not disputed that statement in a responsive 56.1
statement, nor have they proposed a competing version of the
facts anywhere in the record.[1]  Therefore, the Court deems the
facts set forth in the defendants' 56.1 statement to be admitted,
insofar as they are supported by the factual record in this case.


                                B

     The evidence submitted to the Court reflects the following
facts.

     Northwest Airlines, Inc. ("Northwest") sponsored separate
pension plans for contract employees (the "Contract Plan"), pilot
employees (the "Pilots Plan") and salaried employees (the
"Salaried Plan"), collectively "the Plans."[2]  (Defts.' 56.1 Stmt.
¶ 1.)  The plaintiffs are seven individuals who participated in
the Contract Plan and the Pilots Plan.  (Defts.' 56.1 Stmt. ¶
10.)  The defendants are alleged to be current or former
officers, directors, or management employees of Northwest.
(Defts.' 56.1 Stmt. ¶ 11.)

---

[1]     The facts submitted to the record by the plaintiffs are essentially
confined to an attempt to show that further discovery is needed to determine
crucial facts in this case, and therefore that summary judgment is premature.
This effort is addressed below in the discussion of the plaintiffs' motion for
a continuance.
[2]     Before the 2002 plan year, the Contract Plan was named the "Pension Plan
for Union-Represented Employees."  Before the 2001 plan year, the Salaried Plan
was named the "Retirement Plan for Management Employees."  (Defts.' 56.1 Stmt.
¶¶ 7-8.)

The Plans were structured to be tax-qualified, defined benefit pension plans for the benefit of eligible Northwest employees. As such, each of the Plans was an "employee pension benefit plan" as defined in section 3(2) of ERISA, 29 U.S.C. § 1002(2), a "defined benefit plan" as defined in section 3(35) of ERISA, and a "single-employer plan" as defined in sections 3(41) and 4001(a)(15) of ERISA, 29 U.S.C. §§ 1002(41), 1301(a)(15), and each such plan was subject, during the pre-bankruptcy period, to the minimum funding standards in ERISA as described above. (Defts.' 56.1 Stmt. ¶ 2.)

Northwest was the plan administrator and "named fiduciary" of each of the Plans. Northwest was also the employer responsible for contributing to or under each of the Plans. (Defts.' 56.1 Stmt. ¶¶ 3-5.) Assets of the Plans, and assets of a foreign non-ERISA pension plan, were held in trust under a Master Trust Agreement. Assets of each such plan were accounted for separately under the Master Trust. (Defts.' 56.1 Stmt. ¶ 9.)

On September 14, 2005, Northwest, its parent holding company, and eleven other subsidiaries of the parent company filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Filing"). (Defts.' 56.1 Stmt. ¶ 6.) Prior to the Bankruptcy Filing, there was no delinquency in the contributions required to be made to the Plans under the ERISA minimum funding standards. As

explained below, the absence of any such delinquency is
documented in the annual actuarial statements required for the
Plans under section 103(d) of ERISA, 29 U.S.C. § 1023(d), and
filed as a matter of public record on Schedule B to the Pension
Plans' annual reports on Form 5500.  (Defts.' 56.1 Stmt. ¶¶ 12-
13.)  The factual record includes copies of these actuarial
statements for plan years 2000 through 2005, (see Glick Exs. A-
R), and the plaintiffs have come forward with no evidence to
suggest that there was in fact any delinquency under the
statutory minimum funding standards.

Starting before 2000, Northwest hired Towers, Perrin,
Forster & Crosby, Inc. ("Towers Perrin"), a global professional
services firm, to perform annual actuarial valuations of the
Plans for the purposes of calculating (a) Northwest's pension
cost under Statement No. 87 of the Financial Accounting Standards
Board ("FAS 87") and (b) the minimum required and maximum tax-
deductible contributions under ERISA.  Towers Perrin prepared
annual actuarial valuations for the Plans for the fiscal years
ending December 31, 2000 and later, and for plan years beginning
January 1, 2000 and later.  (Defts.' 56.1 Stmt. ¶¶ 14-15.)

James Glick was the Towers Perrin principal with primary
responsibility for preparation of the annual actuarial valuations
of the Plans.  Mr. Glick has been an "enrolled actuary" under

ERISA since 1983.[3]  In his capacity as an enrolled actuary under
ERISA, Mr. Glick prepared and signed for each of the Plans the
annual actuarial statement submitted on Schedule B to the Plan's
annual report on Form 5500 for plan years that included the 2000-
2005 plan years.  (Defts.' 56.1 Stmt. ¶¶ 16-19.)

     For each of the Plans for the plan years 2000-2005, Towers
Perrin calculated the amount required to be contributed under §
1082.  Using the amount required to be contributed for each plan
year, Towers Perrin also calculated the quarterly installments
(if any) required for each plan year under § 1082(e).
Computation of these quarterly installment amounts, and
determination of the required due dates, were activities
regularly performed by enrolled actuaries under ERISA.  (Defts.'
56.1 Stmt. ¶¶ 20-22.)  The results of these calculations were set
forth in detail in the annual actuarial valuation reports
prepared by Towers Perrin, and are reproduced in the factual
record in this case.  (See Glick Decl. ¶ 8; Glick Ex. S.)[4]

     During the pre-bankruptcy period, the plan year for each of
the Plans ran from January 1 through December 31.  Thus, the last
date on which contributions could be credited for a plan year

---

[3]     An "enrolled actuary" means a person who is enrolled by the Joint Board
for the Enrollment of Actuaries established under subtitle C of Title III of
ERISA.  See Internal Revenue Code § 7701(a)(35), 26 U.S.C. § 7701(a)(35).
[4]     It should be noted that Towers Perrin's calculations of the minimum
required contributions for the Contract Plan and Salaried Plan reflect waivers
of the minimum funding standards for those plans for the plan year beginning
2003, granted by the Internal Revenue Service (the "IRS") in letters dated
April 15, 2003.  (Defts.' 56.1 Stmt. ¶¶ 23-24.)

under section 302(c)(10)(A)(ii) of ERISA, 29 U.S.C. §
1082(c)(1)(A)(ii), was September 15 of the following year.  The
times for payment of quarterly installments were April 15, July
15, and October 15 of each year, and January 15 of the following
year.  (Defts.' 56.1 Stmt. ¶ 25.)

Using these parameters, Towers Perrin calculated the minimum
required contributions for the Plans on or after January 15, 2000
and on or before September 14, 2005.  These calculations, and the
amounts that Northwest actually contributed to the Plans' Master
Trust, are set forth in the factual record.  (See Glick Decl. Ex.
S; Richardson Decl. ¶ 4.)  The calculations set forth in the
record make clear on their face that there was no delinquency in
the contributions required to be made to the Plans under the
minimum funding standards in § 1082 during the pre-bankruptcy
period.

In addition to the annual funding valuations described
above, which were used to determine the ERISA minimum funding
requirements, Towers Perrin also prepared the annual actuarial
valuations used by Northwest to determine pension costs for
purposes of preparing the company's financial statements.  A
pension plan's "funded status" can be measured as the difference
between the present value of the plan's benefit obligations and
the value of the plan's assets.  (Defts.' 56.1 Stmt. ¶¶ 29, 31.)
These asset and liability measures show that for funding

purposes, the Plans had unfunded accrued liabilities of approximately $656 million as of January 2001, approximately $1.7 billion as of January 2002, approximately $2.7 billion as of January 2003, approximately $2.5 billion as of January 2004, and approximately $2.8 billion as of January 2005; for accounting purposes, the Plans had unfunded accrued liabilities of approximately $1.5 billion as of January 2002, $3.25 billion as of January 2003, $3.0 billion as of January 2004, and $3.3 billion as of January 2005.  (Glick Decl. ¶ 23 (Table).)

However, during the pre-bankruptcy period, the fact that a pension plan had unfunded accrued liabilities did not mean that there was or ever had been any delinquency in meeting the funding requirements under § 1082, because it is plain from the text of that section that ERISA did not require pension plans to be fully funded at all times.  (Glick Decl. ¶ 24.)  Rather, the funding requirements imposed by ERISA were as outlined in the foregoing discussion.

C

In their Amended Complaint, the plaintiffs allege that Northwest failed to fund the Plans as it was required to do under ERISA.  (Am. Compl. ¶¶ 4, 137.)  They allege that the defendants had knowledge of the financial health of the company and therefore knew or should have known that the Plans would be

"radically underfunded."  (Am. Compl. ¶¶ 115-18.)  They further
allege that a reasonably prudent fiduciary in the circumstances
would have acted to protect the participants against losses that
could have been avoided.  (Am. Compl. ¶ 119.)

The plaintiffs also allege that the defendants failed to
disclose the Plans' significant funding shortfalls to their
participants, preventing the participants from making informed
decisions regarding the Plans.  (Am. Compl. ¶¶ 122-24.)  Also,
because a significant percentage of director and officer
compensation during the pre-bankruptcy period was in the form of
stock or stock option grants and because the Plans' assets
included more than five percent of Northwest's outstanding stock,
the plaintiffs allege that the defendants had a conflict of
interest between protecting their own interests as executives and
stockholders or the interests of the Plans' participants.  (Am.
Compl. ¶¶ 125-30.)


                                III

The defendants move for Stage One summary judgment as to
whether there was an actionable delinquency in the contributions
required to be made to the Plans at any time during the pre-
bankruptcy period under § 1082, or any other alleged funding
delinquency in the Plans.  All of the plaintiffs' claims are
predicated on the alleged existence of such a delinquency, (Am.

Compl. ¶ 4), and therefore the defendants move for summary judgment on all of the plaintiffs' claims.

The defendants argue that summary judgment is merited based on the lack of a funding deficiency under the ERISA minimum funding standards imposed by § 1082. As detailed above, the defendants have submitted abundant evidence to establish that there was no funding deficiency under the minimum funding standards, and the plaintiffs have not submitted any evidence to the contrary. Therefore, it is plain from the evidence submitted by the defendants that there was no funding deficiency under the ERISA minimum funding standards.

The plaintiffs argue that whether summary judgment is warranted does not depend solely on whether there was a funding deficiency under the § 1082 minimum funding standards, because the minimum funding standards were not the only means of measuring whether the Plans were properly funded under ERISA, or whether the defendants breached their fiduciary duties. Put another way, the plaintiffs argue that there may have been an actionable funding delinquency even if there was no funding deficiency under the § 1082 minimum funding standards. The plaintiffs move for a continuance pursuant to Fed. R. Civ. P. 56(f) in order to conduct additional discovery.

A

ERISA establishes a "uniform regulatory regime" for employee benefit plans, and the statute is "intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'"  Aetna Health, Inc. v. Davila, 542 U.S. 200, 208 (2004) (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981)).  During the pre-bankruptcy period, the only provisions in ERISA governing the amount of contributions required to fund the kind of pension plan that Northwest sponsored – a single-employer, defined benefit employee pension plan - were section 302 of ERISA, 29 U.S.C. § 1082, through its minimum funding standards, and the sections that cross-referenced § 1082 and elaborated on it.  There simply was not another provision in ERISA or outside of it that purported to govern the amount of contributions necessary to fund such a pension plan. It is therefore plain from the text of ERISA and the absence of authorized alternatives that the exclusive way to determine whether the Plans were under-funded, and thus whether there was an actionable funding delinquency, is to determine whether there was a funding deficiency under the § 1082 minimum funding standards.

The plaintiffs argue that the Court should look elsewhere than the minimum funding standards of § 1082 to determine whether the Plans were under-funded, but they have produced no legal

authority to support this argument.[5]   The plaintiffs resort

primarily to the broad language with which ERISA imposes

fiduciary duties on pension plan managers, and holds those

fiduciaries to the care, skill, prudence, and diligence of a

prudent man.   They argue that the "prudent man" standard

contemplates a greater fiduciary duty than that imposed by the

minimum funding standards.   But the imposition of broad fiduciary

duties on the defendants by ERISA does not provide an alternative

to the minimum funding standards for determining whether there

was an actionable funding delinquency with respect to the Plans,

because there is no freestanding fiduciary duty to fund a pension

plan.   See Sasso v. Cervoni, 985 F.2d 49, 51 (2d Cir. 1993) ("[A]

corporate employer does not have a fiduciary obligation to make

trust fund contributions").   Indeed, "[n]othing in ERISA requires

employers to establish employee benefits plans.   Nor does ERISA

mandate what kind of benefits employers must provide if they

choose to have such a plan."   Lockheed Corp. v. Spink, 517 U.S.

882, 887 (1996).   Because there is no freestanding fiduciary duty

to fund a pension plan, outside the requirements ERISA imposes

---

[5]      The cases cited by the plaintiffs have nothing to do with funding
requirements for pension plans.   For example, the plaintiffs cite Donovan v.
Bierwirth, 754 F.2d 1049 (2d Cir. 1985) to support their argument that the
satisfaction of the minimum funding standards does not resolve whether there
was a funding delinquency with respect to the Plans under ERISA.   But the issue
in Donovan was whether, "if securities are purchased in breach of trust but are
later sold at a price exceeding the purchase price, [there is] a 'loss' within
the meaning of ERISA section 409?"   Id. at 1052.   The issue in this case is an
entirely unrelated one: whether there can be an actionable delinquency in the
funding of a pension plan under ERISA if the minimum funding standards imposed
by ERISA are met.   Thus Donovan does not control this case.

under § 1082 once a plan has already been established, there is no basis for the argument that by imposing broad fiduciary duties on pension plan managers, ERISA somehow imports a fiduciary duty to fund a plan that surpasses the requirements of § 1082.  Thus there could be no showing of an actionable delinquency with respect to the Plans without some evidence that the Plans did not meet the minimum funding standards under § 1082, which the plaintiffs have failed to provide.

Because the minimum funding standards of § 1082 and the methods prescribed therein to determine funding delinquencies were exclusive, it is irrelevant whether the Plans would have been under-funded had different measures of plan funding, such as accounting measures (as the plaintiffs suggest), been used. During the pre-bankruptcy period, there was no authority under ERISA, or the fiduciary duties that ERISA incorporated, to make determinations about possible funding delinquencies based on measures other than those detailed in § 1082.  The importance of deferring to ERISA's definition of a funding delinquency is clear.  ERISA is a creation by statute that establishes a detailed scheme.  As explained above, there is no obligation for employers to establish pension plans at all.  ERISA reflects a balance of Congress' desire to offer enhanced employee protections, and "its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly

discourage employers from offering welfare benefit plans in the first place." Varity Corp. v. Howe, 516 U.S. 489, 497 (1996). The Supreme Court has warned against expanding liability beyond that intended by Congress, "lest the cost of federal standards discourage the growth of private pension plans." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 148 n.17 (1985).  It is not for this Court to interfere with the carefully circumscribed rules that are reflected in the details of ERISA.

The plaintiffs appear to argue that even if there was no actionable funding delinquency with respect to the Plans, the defendants may have breached other fiduciary duties unrelated to funding.  (See Vitagliano Decl. ¶ 6. ("Compliance with the [ERISA] funding requirements by meeting minimum funding requirements of the funding standard account alone does not equate to the satisfaction of all fiduciary duties owed by plan fiduciaries"); Trinko Decl. ¶ 3 ("Based on my experience, it is my belief that the satisfaction of minimum funding requirements for the subject pension plans is not dispositive of whether the fiduciaries of the pension plans fulfilled their fiduciary duties to said plans.")[6]  This argument is without merit.  All of the counts alleged in the plaintiffs' Amended Complaint are predicated upon the existence of an actionable funding delinquency.  Plaintiffs' counsel conceded that this was true

---

[6]    The statements by Mr. Trinko, the plaintiffs' counsel, as to his belief have no evidentiary value.

when the motion was argued.  The plaintiffs have failed to provide any evidence of that key aspect of their claims.

Moreover, the plaintiffs fail to explain how, absent a funding delinquency, the defendants breached any of their fiduciary duties.  For example, the plaintiffs point out that the defendants had a duty to investigate possible claims arising from a funding delinquency, and that under ERISA, trustees had a fiduciary duty to act to ensure that the Plans received all funds to which they were entitled, but they do not explain how the defendants could have violated these duties in the absence of a funding delinquency – that is, where the Plans were indeed receiving all funds to which they were entitled.  Similarly, the plaintiffs have not explained how the defendants may not have "act[ed] in the sole best interests of pension plan beneficiaries," (Vitagliano Decl. ¶ 7), if the Plans were being properly funded as required by ERISA.  The existence of a funding delinquency is essential to the plaintiffs' claims; without one, they have no basis.

For all of the foregoing reasons, the defendants have established that there is no genuine issue of material fact and the Plans were properly funded.  Therefore, the defendants are entitled to summary judgment dismissing all of the plaintiffs' claims.

B

The plaintiffs request a continuance under Fed. R. Civ. P. 56(f) in order to ward off summary judgment.  The plaintiffs claim that a continuance is needed to investigate further whether the minimum funding standards set by § 1082, were met, and more broadly, whether the defendants breached their fiduciary duties with respect to the Plans.

Rule 56 of the Federal Rules of Civil Procedure provides:

If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1)  deny the motion;

(2)  order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3)  issue any other just order.

Fed. R. Civ. P. 56(f).

A party resisting summary judgment on the grounds that the party needs additional discovery must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.  See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999); Cooney v. Consol. Edison, 220 F.Supp.2d 241, 247-48 (S.D.N.Y. 2002), aff'd, 63 Fed. Appx. 579, 2003 WL

21105351 (2d Cir. 2003); see also DeLuca v. Bank of Tokyo-Mitsubishi UFJ, Ltd., 06 Civ. 5474, 2008 WL 857492, at *17 (S.D.N.Y. Mar. 31, 2008); Estevez-Yalcin v. Children's Vill., 331 F.Supp.2d 170, 179-80 (S.D.N.Y. 2004).  A district court's decision whether to grant a Rule 56(f) motion for a continuance is discretionary.  See, e.g., Axis Reinsurance Co. v. Bennett, No. 07 Civ. 7924, 2008 WL 2485388, at *7 (S.D.N.Y. June 19, 2008).

Through the declarations they have submitted to the Court,[7] the plaintiffs adopt a scattershot approach to identifying the facts sought to oppose the motion for summary judgment.  They cast a wide net seeking discovery much of which, if conducted, would shed no light on the Stage One question.  Among other things, the plaintiffs request discovery of the compensation paid to the Plans' fiduciaries, discovery regarding the criteria by which the fiduciaries were chosen, discovery regarding the fiduciaries' awareness of Northwest's deteriorating financial condition, and discovery regarding the financial and business relationship the fiduciaries had with Northwest.  (See Trinko Decl. ¶ 4; Vitagliano Decl. ¶ 12.)  Discovery of these facts would have no bearing whatsoever on the question of whether the Plans were under-funded.  These requests do not pertain even nominally to the Stage One question; they reflect a wide-ranging

---

[7]     The Court treats the Declarations submitted by the plaintiffs as Affidavits for purposes of the Rule 56(f) motion.

search for discovery that does not bear on the Stage One question.

The plaintiffs also make requests for additional discovery that do purport to relate to the funding of the Plans, but these requests fail to present any possibility of raising genuine issues of material fact with respect to whether the Plans were under-funded with respect to ERISA's minimum funding standards.

The plaintiffs request additional discovery as to the accounting measures Northwest used to determine pension costs and obligations for financial statement disclosures, and as to the PBGC's estimate of the Plans' unfunded benefit liabilities on a termination basis. But the defendants have shown that such accounting measures and estimates were not implicated in the calculations relevant to ERISA's minimum funding standards. The defendants have also shown that they have produced extensive documents relating to the accounting measures used by Northwest. Thus, further discovery of these facts would not be material to the Stage One question.

The plaintiffs request additional discovery regarding whether the actuarial assumptions and methods used by the enrolled actuary in performing the minimum funding calculations reflected the actuary's best estimate of anticipated experience under the Plans, as required by statute. See ERISA § 302(c)(3)(A) and (B), 29 U.S.C. §§ 1082(c)(3)(A) and (B). The

contemporaneous Schedule B's signed by the actuary were provided to the plaintiffs and these reports contain the actuarial assumptions and methods used by the actuary.  The plaintiffs have failed to show why they need additional discovery or how additional discovery along these lines would create a genuine issue of material fact as to the minimum funding standards being met.  The best estimate requirement "is basically procedural in nature and is principally designed to insure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of plan administrators or sponsors." Wachtel, Lipton, Rosen & Katz v. Commissioner, 26 F.3d 291, 296 (2d Cir. 1994).  The actuary's work needed only to be "reasonable," see id., and the actuarial valuation reports provided by the defendants in discovery needed only to provide sufficient information for "another actuary qualified in the same practice area [to] make an objective appraisal of the reasonableness of the actuary's work as presented in the actuary's report." Actuarial Standard of Practice No. 41, Actuarial Communications, § 3.3.3 (Actuarial Standards Board, March 2002).)[8]  Despite the extensive discovery provided to the plaintiffs and the availability of that discovery for review by any expert for the plaintiffs, the plaintiffs have not come forward with any reason to believe that the assumptions and methods used by the enrolled

_____

[8]    This document is in the record at Exhibit B to the second Gigot Declaration.

actuary were faulty, and thus their request to probe this issue further does not warrant a continuance.

The plaintiffs' request for additional discovery with respect to the IRS funding waivers for the 2003 plan year is similarly without basis, because the significance of the waivers is self-evident and needs no elaboration.  The waivers meant that the IRS waived the minimum funding standards for Northwest's Contract and Salaried Plans for the 2003 plan year.  (Meginnes Decl. Exs. A, B.)  The plaintiffs fail to explain how any additional discovery could possibly reveal a different meaning.  The legal significance of the waivers is already plain.

In addition, the plaintiffs have failed to demonstrate any serious effort to obtain the sought-after facts, and have not explained why a more diligent effort was not made.  The plaintiffs were afforded five months to pursue discovery to establish that there was at least a genuine issue of material fact as to whether there was a funding delinquency in the Plans under ERISA, or indeed any funding delinquency.  The plaintiffs had successfully resisted the motion to dismiss based on their assertion that they were indeed alleging funding deficiencies that were contrary to ERISA funding requirements.  See Cress v. Wilson, No. 06 Civ. 2717, 2007 WL 1686687, at *6.

The plaintiffs failed to use the opportunity for discovery to produce any evidence to support their allegation that there

was an actionable funding deficiency or to contradict the
substantial evidence submitted by the defendants that there was
no such deficiency.  During the course of this litigation, the
plaintiffs filed only one set of document requests, which was
revised once.  (See Trinko Reply Decl. ¶¶ 2-3.)  The defendants
produced over 195,000 pages of documents.  (Second Gigot Decl. ¶
5.)  There is no indication that the plaintiffs ever raised any
discovery issue with the Court or the Magistrate Judge or alleged
any complaint over the production of documents or any other
evidence.

The plaintiffs failed to take even one deposition over the
course of discovery, not even the deposition of the actuary who
attested that there was no funding deficiency under ERISA.
Furthermore, the plaintiffs failed to make any expert disclosures
by the February 15, 2008 deadline.  The plaintiffs failed to
produce any expert report to suggest that the Plans did not
comply with ERISA funding requirements.  The only alleged expert
affidavits submitted by the defendants in the course of the
present motion, and not disclosed as required by February 15,
2008, only sought additional documents, and did not explain why,
if additional documents were sought, they were not sought in a
timely fashion.  The absence of expert reports is conspicuous, in
light of the inherently technical nature of the plaintiffs'

allegations with respect to calculating an ERISA funding deficiency.

In short, this is a case in which the defendants produced substantial discovery, (see, e.g., Second Gigot Decl. ¶ 5; Amended Glick Decl. ¶¶ 8, 17, 27), and the plaintiffs did not complain about the sufficiency of that discovery until faced with a motion for summary judgment.  The plaintiffs have since made a host of requests for additional discovery, many of which have nothing to do with the funding of the Plans, and none of which have the potential to create a genuine issue of material fact as to the satisfaction of the minimum funding standards under ERISA. Satisfaction of the minimum funding standards under ERISA turned on a specific set of mathematical calculations that the defendants have shown, through substantial evidence, to demonstrate that there was no under-funding under ERISA in this case.  As the Court of Appeals has explained: "[I]t is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery may uncover.  An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify denial of the motion."  Contemporary Mission, Inc. v. United States Postal Service, 648 F.2d 97, 107 (2d Cir. 1981); see also Amaker v. Goord, No. 98 Civ. 3634, 2002 WL 523371, at *5

(S.D.N.Y. Mar. 29, 2002); Weinstein v. Albright, No. 00 Civ. 1193, 2000 WL 1154310, at *12 (S.D.N.Y. Aug. 14, 2000), aff'd, 261 F.3d 127 (2d Cir. 2001).  Therefore, there is no basis to grant the plaintiffs' motion for a continuance under Rule 56(f).

CONCLUSION

The Court has considered all of the parties' arguments.  To the extent not specifically addressed they are either moot or without merit.  For all of the foregoing reasons, the defendants' motion for summary judgment is **granted**, and the plaintiffs' motion for a continuance is **denied.**  The Clerk is directed to close Docket Nos. 50 and 62, and to enter judgment dismissing the Amended Complaint and closing this case.

SO ORDERED.

Dated:  New York, New York
      December 24, 2008

                                    John G. Koeltl
                            United States District Judge